FILED
2013 Mar-25  PM 04:46
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| **ETERNAL WORD TELEVISION NETWORK, INC.,** | } | |
| | } | |
| **Plaintiff,** | } | |
| | } | |
| **v.** | } | **CASE NO. 2:12-cv-501-SLB** |
| | } | |
| **KATHLEEN SEBELIUS, Secretary of the United States Department of Health and Human Services,** | } | |
| | } | |
| **UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES,** | } | |
| | } | |
| **HILDA SOLIS, Secretary of the United States Department of Labor,** | } | |
| | } | |
| **UNITED STATES DEPARTMENT OF LABOR,** | } | |
| | } | |
| **TIMOTHY GEITHNER, Secretary of the United States Department of the Treasury, and** | } | |
| | } | |
| **UNITED STATES DEPARTMENT OF THE TREASURY,** | } | |
| | } | |
| **Defendants.** | } | |

## MEMORANDUM OPINION

On February 9, 2012, Eternal Word Television Network, Inc. ("EWTN") filed a

Complaint in this court naming Kathleen Sebelius, Secretary of the United States Department

of Health and Human Services; the United States Department of Health and Human Services;

Hilda Solis, Secretary of the United States Department of Labor; the United States Department of Labor; Timothy Geithner, Secretary of the United States Department of the Treasury; and the United States Department of the Treasury as defendants (collectively "defendants"). (Doc. 1.)[1] EWTN's Complaint, as amended on March 21, 2012, alleges that defendants promulgated regulations pursuant to the Patient Protection and Affordable Care Act, Pub. L. 111-148, 124 Stat. 119 (2010), and the Health Care and Education Reconciliation Act, Pub. L. 111-152, 124 Stat. 1029 (2010) (collectively "Affordable Care Act" or "ACA") in violation of (1) the Religious Freedom Restoration Act, 42 U.S.C. § 2000bb et seq., (2) the Free Exercise Clause of the First Amendment, U.S. Const. amend. I, (3) the Establishment Clause of the First Amendment, U.S. Const. amend. I, (4) the Freedom of Speech Clause of the First Amendment, U.S. Const. amend. I, and (5) the Administrative Procedure Act, 5 U.S.C. 550 et seq. (Doc. 13 ¶¶ 118-205.)

This case is currently before the court on defendants' Motion to Dismiss pursuant to Federal Rule of Civil Procedure 12(b)(1). (Doc. 29.) Upon consideration of the record, the submissions of the parties, and the relevant law, the court is of the opinion that defendants' Motion to Dismiss is due to be granted.

---

[1] Reference to a document number, ("Doc. __"), refers to the number assigned to each document as it is filed in the court's record.

# I. FACTS, STATUTORY BACKGROUND, AND PROCEDURAL HISTORY[2]

## A.  Eternal Word Television Network

In 1981, Mother Angelica, a Catholic nun of the Poor Clares of Perpetual Adoration order, founded EWTN in Irondale, Alabama.  (Doc. 13 ¶ 2.)  EWTN is "dedicated to the advancement of truth as defined by the Magisterium of the Roman Catholic Church."  (*Id.* ¶ 23.)  Its mission is "to serve the orthodox belief and teaching of the Church as proclaimed by the Supreme Pontiff and his predecessors."  (*Id.*)  EWTN claims to be the world's largest Catholic media network: among other things, it transmits television programing through eight different services, broadcasts in both English and Spanish, has two 24-hour radio services, and maintains a popular website.  (*Id.* ¶¶ 2, 21.)  Currently, EWTN has more than 300 employees.  (*Id.* ¶ 27.)

EWTN promotes the Roman Catholic Church's teachings regarding the sanctity of human life and the purpose of human sexuality.  (*Id.* ¶ 24-25.)  In terms of the sanctity of human life, EWTN teaches that "all . . . life is sacred and precious, from the moment of conception."  (*Id.* ¶ 24.)  Accordingly, it believes that "abortion ends a human life and is a grave sin."  (*Id.*)  Regarding human sexuality, EWTN believes that it has two main purposes: (1) to closely unite husband and wife and (2) to generate new life.  (*Id.* ¶ 25.)  Thus, EWTN both believes and teaches that "any action which either before, at the moment of, or after

---

[2]   For purposes of this Opinion, the "facts" alleged in the Amended Complaint are accepted as true.  *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 572 (2007); *Resnick v. AvMed, Inc.*, 693 F.3d 1317, 1321-22 (11th Cir. 2012) (citing *Lanfear v. Home Depot, Inc.*, 679 F.3d 1267, 1271 n.4 (11th Cir. 2012)).

sexual intercourse, is specifically intended to prevent procreation, whether as an end or as a means—including contraception and sterilization—is a grave sin." (*Id.* (internal quotation marks and citation omitted).)

In accordance with these beliefs, EWTN provides health care coverage that it considers to be "superior to coverage generally available in the Alabama market," (*id.* ¶ 28), but which excludes coverage for artificial contraception, sterilization, and abortion, (*id.* ¶ 30). EWTN claims that it cannot provide health insurance covering "artificial contraception, sterilization, or abortion, or related education and counseling, without violating its deeply held religious beliefs." (*Id.* ¶ 29.) EWTN's employee insurance plan is a self-funded plan administered by Blue Cross/Blue Shield of Alabama that begins annually on July 1. (*Id.* ¶ 32, doc. 33 at 10, 12.)

EWTN operates off of donations from the public and does not generate revenue from carriage fees or advertising. (Doc. 13 ¶ 33.) It claims that its donors give with an understanding of its mission and with the aim that their donations will further EWTN's adherence to, dissemination of, and reporting of reliable teachings on Catholic morality and practices. (*Id.*) Thus, according to EWTN, using donated funds for purposes known to be morally repugnant to its donors would violate an implicit trust between the donors and the network. (*Id.* ¶ 34.)

**B. Statutory and Regulatory History**

In March of 2010, Congress passed the ACA. *See* Patient Protection and Affordable

4

Care Act, Pub. L. No. 111-148, 124 Stat. 119 (2010); Health Care and Education Reconciliation Act, Pub. L. No. 111-152, 124 Stat. 1029 (2010) (amending the ACA). Section 1001 of the ACA added section 2713 to the Public Health Service Act ("PHSA"). *See* 42 U.S.C. § 300gg-13.  Section 2713, in response to the American public's use of preventive health care services at approximately half the recommended rate, (*see* doc. 29-1 at 10), requires, in part, the inclusion of certain preventative care measures in health care plans:

> group health plan[s][3] and [] health insurance issuer[s] offering group or individual health insurance coverage shall . . . provide coverage [without] any cost sharing requirements for–
>
> (1) evidence-based items or services that have in effect a rating of "A" or "B" in the current recommendations of the United States Preventive Services Task Force; [and]
>
>      . . . .
>
> (4) with respect to women, such additional preventive care and screenings not described in paragraph (1) as provided for in comprehensive guidelines supported by the Health Resources and Services Administration for purposes of this paragraph.

42 U.S.C. § 300gg–13(a)(1), (4).

Through section 2713 of the PHSA, Congress intended to increase the public's access

---

[3]  A group health plan includes a plan maintained by an employer that provides medical care to employees.  *See* 42 U.S.C. § 300gg-91(a)(1).  Group health plans may be insured (i.e., underwritten through an insurance contract) or self-insured (i.e., funded directly by the employer).  The ACA does not require employers to provide health coverage for their employees, but, beginning in 2014, some large employers may be required to make payments if they fail to provide insurance.  *See* 26 U.S.C. § 4980H(a)-(d).

to and use of recommended preventive services.  *See* Interim Final Rules Relating to Coverage of Preventive Services Under the ACA, 75 Fed. Reg. 41,726, 41,729 (July 19, 2010).  As demonstrated above, the Affordable Care Act gives the Health Resources and Services Administration ("HRSA")—a division of defendant Department of Health and Human Services ("HHS")—the authority to develop guidelines determining the recommended preventive services.  *See* 42 U.S.C. § 300gg–13(a)(4).  Because no HRSA guidelines relating to preventive care and screening for women existed when the ACA was passed, HHS commissioned the Institute of Medicine ("IOM") to recommend a set of comprehensive guidelines.  (*See* doc. 13 ¶ 60); *Women's Preventive Services: Required Health Plan Coverage Guidelines*, HRSA, http://www.hrsa.gov/womensguidelines/ (last visited Mar. 21, 2013) [hereinafter *Preventive Services Guidelines*].

On July 19, 2010, defendants promulgated interim final rules that implemented section 2713 of the PHSA.  *See* 75 Fed. Reg. at 41,726, 41,728.  In relevant part, the interim final rules require group health plans or health insurance issuers to provide coverage for newly recommended preventive services, without cost-sharing, for plan years (or policy years) that begin "on or after the date that is one year after the date the [new] recommendation or guideline is issued."  26 C.F.R. § 54.9815-2713T(b)(1); 29 C.F.R. § 2590.715-2713(b)(1); 45 C.F.R. § 147.130(b)(1).  In other words, plans must comply with the new recommendations for preventive services starting with the plan year that begins on or after the one year anniversary of the issuance of the new recommendations.  However, the interim

final rules further specify that these requirements do not apply to "grandfathered health plans." 75 Fed. Reg. at 41,729.  Grandfathered plans are those "in which an individual was enrolled on March 23, 2010" that also comply with certain additional regulations.  *See* 26 C.F.R. § 54.9815-1251T(a); 29 C.F.R. 2590.715-1251(a); 45 C.F.R. § 147.140(a). However, a plan may lose its grandfathered status if it undergoes one or more of the changes set forth in 45 C.F.R. § 147.140(g)(1) after March 23, 2010.  *See also* 26 C.F.R. § 54.9815-1251T(g)(1); 29 C.F.R. § 2590.715-1251(g)(1).  The parties agree that EWTN has alleged that its plan is not eligible for grandfather status.[4]

On July 19, 2011, one year after the interim final rules were first issued, IOM published its report, which included the preventative services guidelines. (*See* doc. 13 ¶ 63); Institute of Medicine, *Clinical Preventive Services for Women: Closing the Gaps* (July 19, 2011), *available at* http://www.iom.edu/Reports/2011/Clinical-Preventive-Services-for-Women-Closing-the-Gaps.aspx .  The report recommends that the HRSA guidelines include, among other services, well-woman visits, breastfeeding support, domestic violence screenings, *id.* at 110, 117, 123, and, most relevant in this case, "the full range of [FDA]-approved contraceptive methods, sterilization procedures, and patient education and counseling for women with reproductive capacity."  *Id.* at 109-10.  FDA-approved contraceptive methods include intrauterine devices, oral contraceptive pills, emergency

---

[4]  Initially, defendants contended that EWTN had not pled sufficient facts to show its plan fell outside the grandfather provision.  However, in their Reply, defendants concede that EWTN does not provide a grandfathered plan.  (Doc. 36 at 3 n.1.)

contraceptives, and diaphragms. (*See* doc. 13 ¶ 64); FDA, *Birth Control Guide*, *available at* http://www.fda.gov/ForConsumers/ByAudience/ForWomen/ucm118465.htm (last visited March 21, 2012).

On August 1, 2011, HHS adopted IOM's recommendations in full by issuing an amendment to the interim final rules. *See* Group Health Plans and Health Insurance Issuers Relating to Coverage of Preventive Services Under the Patient Protection and Affordable Care Act, 76 Fed. Reg. 46,621, 46,625 (Aug. 3, 2011); *Preventive Services Guidelines*, *supra* ("HRSA is supporting the IOM's recommendations on preventive services that address health needs specific to women and fill gaps in existing guidelines."). The amended rule lists an effective date of August 1, 2011, and also states that "[t]hese interim final regulations generally apply to group health plans and group health insurance issuers on August 1, 2011." 76 Fed. Reg. at 46,621. Under the requirements discussed earlier, this means that group health plans and health insurance issuers were required to provide coverage for the newly recommended services as of August 1, 2012, one year from when they were added to the guidelines. *See* 42 U.S.C. § 300gg-13(b)(1), (2); 76 Fed. Reg. at 46,623, 46,624.

However, the interim final rules, as amended ("the amended interim final rules" or "the Mandate"), also contain an exception for group health plans sponsored by religious employers, releasing those employers from any requirement to cover contraceptive services under the HRSA guidelines.[5]    76 Fed. Reg. at 46,623, 46,626; 45 C.F.R. §

---

[5]  The exception became effective on August 3, 2011. *See* 45 C.F.R. § 147.130.

147.130(a)(1)(iv)(A); *see also Preventive Services Guidelines*, *supra* ("[P]lans sponsored by certain religious employers . . . are exempt from the requirement to cover contraceptive services."). In order to qualify for the religious employer exemption outlined in the Mandate, an employer must meet each of the following four criteria:

> (1) The inculcation of religious values is the purpose of the organization.
>
> (2) The organization primarily employs persons who share the religious tenets of the organization.
>
> (3) The organization serves primarily persons who share the religious tenets of the organization.
>
> (4) The organization is a nonprofit organization as described in section 6033(a)(1) and section 6033(a)(3)(A)(i) or (iii) of the Internal Revenue Code of 1986, as amended.

45 C.F.R. § 147.130(a)(1)(iv)(B). EWTN asserts in its Amended Complaint that it is reasonably certain that it does not qualify for the exemption. (*See* doc. 13 ¶ 75, 78-83, 186; doc. 33 at 14.)[6] Accordingly, under the Mandate, providers of non-exempt and non-grandfathered health care plans, like EWTN, are required to provide coverage for recommended contraceptive services, without cost sharing, for plan years beginning on or after August 1, 2012. *See id.* § 147.130(a)-(d).

Defendants solicited comments on the Mandate and specifically requested feedback

---

[6] Specifically, based on the facts that EWTN alleges, it appears that it does not qualify under any part of the four-part exemption. (*See* doc. 13 ¶ 75, 78-83.) Defendants agree that EWTN is not exempt under this provision. (*See* doc. 36 at 10.)

on the definition of religious employer.[7]  76 Fed. Reg. at 46,623 ("We will be accepting

comments on this definition as well as alternative definitions . . . .").  After considering the

comments received, on February 15, 2012, defendants adopted as final the definition of

religious employer that was originally contained within the amended interim final rules,

stating that the religious employer exemption was finalized "without change."  Group Health

Plans and Health Insurance Issuers Relating to Coverage of Preventive Services Under the

Patient Protection and Affordable Care Act, 77 Fed. Reg. 8725, 8725, 8729, 8730 (Feb. 15,

2012).  This finalized version of the Mandate read as follows:

> Section 2712 of the PHS[A], as added by the [ACA,] . . . ,
> requires that non-grandfathered group health plans and health
> insurance issuers offering group or individual health insurance
> coverage provide benefits for certain preventive health services
> without the imposition of cost sharing. These preventive health
> services include, with respect to women, preventive care and
> screening provided for in the comprehensive guidelines
> supported by [HRSA] that were issued on August 1, 2011
> (HRSA Guidelines). As relevant here, the HRSA Guidelines
> require coverage, without cost sharing, for "[a]ll Food and Drug
> Administration . . . approved contraceptive methods,
> sterilization procedures, and patient education and counseling
> for all women with reproductive capacity," as prescribed by a
> provider.  Except as discussed below, non-grandfathered group
> health plans and health insurance issuers are required to provide

_____

[7]  Comments were solicited after the Mandate had been implemented (as opposed to
before, in accordance with the Administrative Procedure Act's notice and comment
requirements) based on authority to "promulgate any interim final rules as . . . appropriate" under
section 9833 of the Internal Revenue Code, section 734 of ERISA, and section 2792 of the
PHSA.  *See* 76 Fed. Reg. at 46,624.  However, among its other claims, EWTN also challenges
the issuance of the Mandate without proper notice and comment under the Administrative
Procedure Act.  (Doc. 13 ¶¶ 10, 65, 179-83.)

> coverage consistent with the HRSA Guidelines, without cost
> sharing, in plan years (or, in the individual market, policy years)
> beginning on or after August 1, 2012. . . .

*Id.* at 8725-26 (footnotes omitted).

Importantly however, the finalized rules also provide a "temporary enforcement safe harbor" ("safe harbor") from enforcement of the Mandate for non-exempt employers with religious objections to covering contraceptive services.  *Id.* at 8727.  The safe harbor was implemented in response to the many comments defendants received on the religious employer exemption as defined in the amended interim final rules.  *Id.* at 8726-27.  Defendants explained that during the operation of the safe harbor, they would "plan to develop and propose changes to the[] final regulations" in order to meet two goals: "providing contraceptive coverage without cost-sharing . . . and accommodating non-exempted, non-profit organizations' religious objections to covering contraceptive services . . . ." *Id.* at 8727.  They further stated that they would "work with stakeholders to propose and finalize this policy before the end of the temporary enforcement safe harbor." *Id.* at 8728-29.  On February 10, 2012, prior to the issuance of the final rule on February 15, 2012, HHS issued a guidance describing the safe harbor and stating that defendants would wait an additional year before enforcing the Mandate against certain non-exempt religious organizations.[8]  (*See* doc. 13 ¶ 87, ¶ 87 n.2); HHS, *Guidance on the Temporary Enforcement*

---

[8]  However, this was not the first time that defendants had publicly discussed the possibility of a safe harbor going into effect.  On January 20, 2012, defendant Sebelius

*Safe Harbor*, 3 (Feb. 10, 2012), *available at* http://cciio.cms.gov/resources/files/Files2/
02102012/20120210-Preventive-Services-Bulletin.pdf.  In other words, the safe harbor will
operate until the first plan year that begins on or after August 1, 2013.  *Id.*

In order to qualify for the safe harbor, an employer must meet all of the following four
criteria:

> (1) The organization is organized and operates as a non-profit entity.
>
> (2) From February 10, 2012 onward, contraceptive coverage has not been provided at any point by the group health plan established or maintained by the organization, consistent with any applicable State law, because of the religious beliefs of the organization.
>
> (3) As detailed below, the group health plan established or maintained by the organization (or another entity on behalf of the plan, such as a health insurance issuer or third-party administrator) must provide to participants the attached notice, as described below, which states that contraceptive coverage will not be provided under the plan for the first plan year beginning on or after August 1, 2012.
>
> (4) The organization self-certifies that it satisfies criteria 1-3 above, and documents its self-certification in accordance with the procedures detailed herein.

---

referenced the safe harbor in a statement on behalf of the HHS.  (*See* doc. 13 ¶ 85); *A Statement by U.S. Department of Health and Human Services Secretary Kathleen Sebelius*, HHS.gov (Jan. 20, 2012), http://www.hhs.gov/news/press/2012pres/01/20120120a.html [hereinafter *Statement by Sebelius*].  She explained that the additional time would allow employers "more time and flexibility to adapt," and that the HHS would "continue to work closely with religious groups during th[e] transitional period to discuss their concerns."  *Statement by Sebelius*, *supra*.

*Id.*  Consequently, if a noncomplying employer does not fall under either the provision above or the religious exemption, and it does not qualify as grandfathered, it will face large fines. *See* 26 U.S.C. § 4980H(a); *id.* § 4980H(c)(1).   Specifically, the fines are set to be approximately $2,000 per year per employee, *see* 26 U.S.C. § 4980H(c)(1), though the number of individual employees will be reduced by thirty for the purposes of calculating the fines each month, *see* 26 U.S.C. 4980H(c)(2)(D)(i)(I).

In accordance with their statements in the finalized Mandate, on March 16, 2012, defendants issued an advance notice of proposed rulemaking ("ANPRM").  *See* Certain Preventive Services Under the Affordable Care Act, 77 Fed. Reg. 16,501 (March 21, 2012); (doc. 13 ¶ 90).  The ANPRM sought to address alternatives for providing women access to contraceptive services without cost-sharing and for accommodating religious organizations' religious liberty interests.  *Id.* at 16,501-03.  The purpose of the ANRPM was to give "an early opportunity for any interested stakeholder to provide advice and input into the policy development relating to the accommodation to be made" in the forthcoming amendments to the regulations.  *Id.* at 16,503.  It purported to adhere to essentially the same two goals that were set forth in the February 15, 2012 final rule: (1) maintaining "the provision of contraceptive coverage without cost sharing to individuals who receive coverage through non-exempt, non-profit religious organizations with religious objections to contraceptive coverage in the simplest way possible"; and (2) protecting "such religious organizations from

having to contract, arrange, or pay for contraceptive coverage." *Id.* It therefore suggested that health insurance issuers offer health insurance coverage without contraceptive coverage to religious organizations that object to it on religious grounds and simultaneously offer contraceptive coverage directly to the organization's plan participants at no charge. *Id.* at 16,505. It also offered ideas and solicited comments on how to accommodate religious organizations that sponsor self-insured group health plans for their employees. *Id.* at 16,503, 16,505-07. Finally, defendants stated in the ANPRM that they intended "to finalize these amendments to the final regulations such that they are effective by the end of the temporary enforcement safe harbor." *Id.* at 16,503.

After a comment period for the ANPRM, defendants issued a Notice of Proposed Rulemaking ("NPRM") on February 1, 2013. *See* Coverage of Certain Preventive Services Under the Affordable Care Act, 78 Fed. Reg. 8456 (Feb. 6, 2013); (doc 75 at 1). As the "next step in the process," 78 Fed. Reg. at 8458, the NPRM proposes changes to the finalized Mandate and requests comments on its suggestions, which may be submitted until April 8, 2013, *see id.* at 8457. It states that its goal is two-fold: First, to amend the religious employer exemption in order to keep an employer from being ineligible solely because its "purposes extend beyond the inculcation of religious values or because the employer serves or hires people of different religious faiths," and second, to "establish accommodations for health coverage [through] . . . eligible organizations . . . with religious objections to contraceptive

14

coverage." *Id.* at 8459.  Among other proposals, the NPRM suggests changing the religious employer exemption "by eliminating the first three prongs of the definition and clarifying the application of the fourth . . . . [so that] . . . an employer that is . . . a nonprofit entity and referred to in section 6033(a)(3)(A)(i) or (iii) of the [Internal Revenue] Code would be considered a religious employer . . . ." *Id.* at 8468-69.  Additionally, consistent with defendants' statements in the ANPRM, the NPRM also maintains that they "intend to finalize all . . . proposed amendments before the end of the temporary enforcement safe harbor." *Id.* at 8459.

## C.  Procedural History

On February 9, 2012, EWTN filed a Complaint in this court which it amended on March 21, 2012.  (*See* doc. 1; doc. 13.)[9]  The Amended Complaint alleges numerous actual and imminent effects the Mandate imposes on EWTN, including: being forced "to provide coverage for contraception, sterilization, abortion, and related education and counseling against its conscience in a manner that is contrary to law," (doc. 13 ¶ 94); being pressured and coerced into changing or violating its religious beliefs, (*id.* ¶ 95); being assessed substantial fines for refusing to change or violate its religious beliefs, (*id.* ¶ 96); being

---

[9]  In its Amended Complaint, EWTN has added only a few paragraphs, consisting primarily of factual developments since the case was first filed on February 9, 2012.  (*See* doc. 13 ¶¶ 86-93, 115-17.)  All twelve counts against defendants remain the same.  (*See id.* ¶¶ 118-205.) EWTN's Amended Complaint refers to both the amended interim final rules promulgated on August 1, 2011, and the version finalized on February 15, 2012, as "the Mandate."  (*See id.* ¶¶ 5, 65, 67, 89, 91, 93.)

burdened in employee recruitment by creating uncertainty as to whether EWTN will be able to offer health insurance beyond a date certain in the future, (*id.* ¶ 97); being forced to provide emergency contraception free of charge, regardless of the ability of the insured persons to obtain emergency contraception from other sources, (*id.* ¶ 109); being forced to facilitate education and counseling concerning contraception, sterilization, and abortion that directly conflicts with EWTN's religious beliefs and teachings, (*id.* ¶ 110); being forced to choose among violating its religious beliefs, incurring substantial fines, or terminating its employee health insurance coverage, (*id.* ¶ 112); and being forced to devote significant institutional resources to determine how to respond to the Mandate, (*id.* ¶ 114).

Based on these allegations, EWTN asserts twelve counts against defendants claiming that the Mandate violates the following: (1) the Religious Freedom Restoration Act, 42 U.S.C. § 2000bb et. seq., ("RFRA") (*id.* ¶¶ 118-129); (2) the First Amendment's Free Exercise Clause because the Mandate is neither neutral nor generally applicable, (*id.* ¶¶ 130-144); (3) the First Amendment's Free Exercise Clause because the Mandate intentionally discriminates, (*id.* ¶¶ 145-150); (4) the First Amendment's Free Exercise Clause because the Mandate discriminates among religions, (*id.* ¶¶ 151-155); (5) the First Amendment's Establishment Clause because the Mandate prefers certain denominations over others, (*id.* ¶¶ 156-160); (6) the First Amendment because the Mandate compels speech, (*id.* ¶¶ 161-167); (7) the First Amendment's guarantee of freedom of speech by expressive association,

(*id.* ¶¶ 168-173); (8) the First Amendment's Free Exercise Clause and guarantee of the freedom of speech because the Mandate allows for unbridled discretion, (*id.* ¶¶ 174-178); (9) the Administrative Procedure Act, 5 U.S.C. § 500 et seq., due to lack of good cause, (*id.* ¶¶ 179-183); (10) the Administrative Procedure Act, 5 U.S.C. § 500 et seq., due to arbitrary and capricious action, (*id.* ¶¶ 184-188); (11) the Administrative Procedure Act, 5 U.S.C. § 500 et seq., for agency action not in accordance with the Weldon Amendment of the Consolidated Security, Disaster Assistance, and Continuing Appropriations Act of 2009, RFRA, and the First Amendment, (*id.* ¶¶ 189-196); and (12) the Administrative Procedure Act, 5 U.S.C. § 500 et seq., for agency action not in accordance with the ACA, (*id.* ¶¶ 197-205).

On May 4, 2012, defendants filed a Motion to Dismiss EWTN's Amended Complaint for lack of subject matter jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(1), (doc. 29), and Memorandum in Support, (doc. 29-1).  Broadly, defendants argue that the case should be dismissed because (1) EWTN lacks standing and (2) the case is not ripe.  (*See* doc. 29-1 at 20, 26.)  Specifically, defendants contend that EWTN lacks standing because it has not "alleged a concrete and imminent injury resulting from the operation of [the Mandate]." (Doc. 29-1 at 20.)  Defendants also argue that the case is not fit for judicial review, and therefore not ripe, because issuance of the ANPRM shows that the regulatory scheme has not taken final shape.  (*Id.* at 26-33.)[10]

---

[10]  After defendants filed their Motion to Dismiss on May 4, 2012, and while the Motion was still pending before the court, the NPRM was issued.  *See generally* 78 Fed. Reg. 8456.

17

EWTN counters that it has standing because (1) it alleges both actual and imminent injuries; (2) its plan is not eligible for grandfather status, making the Mandate directly applicable to its group health plan; (3) the safe harbor does not make its injury non-imminent; (4) the ANPRM does not make its current harm speculative; and (5) the ANPRM's proposed plans will not alleviate its injuries. (Doc. 33 at 14-24).[11]  Additionally, EWTN argues that its claims are presumptively ripe because "they involve facial challenges to the mandate's constitutionality that require no factual development." (*Id.* at 25 (citation omitted).)  EWTN further claims that without judicial review, it would face imminent hardship by operation of the Mandate.  (*Id.* at 30.)

In their Reply, defendants counter that "[b]ecause [they] are amending the challenged regulations to address concerns raised by [EWTN], and [EWTN] has not shown that it will

---

Defendants have diligently kept the court apprised of their position in light of new developments throughout the course of this case.  Accordingly, in regards to the NPRM, defendants argue that "[w]hile defendants' prior assurances and concrete steps toward accommodating employers like plaintiff – the ANPRM, the enforcement safe harbor, and the government's repeated statements committing to the timely establishment of the new accommodations – are sufficient by themselves to establish that plaintiff lacks standing and its claims are not ripe for review, . . . the NPRM further buttresses defendants' promise that they will never enforce the current version of the challenged regulations against plaintiff, further demonstrates concrete action to change those regulations, and further undermines plaintiff's unfounded suggestions that the government will not follow through on its commitment."  (Doc. 74 at 3 (citations omitted).)

[11]  Like defendants, EWTN has also consistently updated the court on its position.  In one of its many helpful supplemental notices to the court, EWTN asserts that the NPRM's proposed change to the religious employer exemption confirms that EWTN will not be exempt from the requirements of the final Mandate.  (*See* doc. 75 at 3.)  It further argues that the NPRM has no effect on its standing or ripeness, and that it does nothing to alleviate the violation of EWTN's religious beliefs.  (*Id.* at 1-5.)

suffer hardship during this amendment process, [EWTN]'s challenge is not ripe."  (Doc. 36 at 14.)  Defendants further point out that not only is there a lengthy delay before they will enforce the Mandate against EWTN, but they have also initiated the amendment process in which EWTN may participate.  (*Id.* at 8.)  According to defendants, these circumstances illustrate the absence of impending injury to EWTN.  (*Id.*)

## II. STANDARD OF REVIEW

Parties invoking federal jurisdiction "bear[] the burden of establishing its existence." *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 104 (1998).  Challenges to subject matter jurisdiction under Fed. R. Civ. P. 12(b)(1) take two forms: "[f]acial attacks" and "[f]actual attacks."  *Lawrence v. Dunbar*, 919 F.2d 1525, 1528-29 (11th Cir. 1990) (per curiam).  Facial attacks "require [] the court merely to look and see if [the] plaintiff has sufficiently alleged a basis of subject matter jurisdiction, and the allegations in his complaint are taken as true for the purposes of the motion."  *Id.* at 1529 (alteration in original) (quoting *Menchaca v. Chrysler Credit Corp.*, 613 F.2d 507, 511 (5th Cir. 1980)).  Factual attacks, alternatively, challenge "the existence of subject matter jurisdiction in fact, irrespective of the pleadings, and matters outside the pleadings, such as testimony and affidavits, are considered."  *Id.* (internal quotation marks and citation omitted).  Given that defendants' Motion to Dismiss questions whether EWTN sufficiently pled facts establishing subject matter jurisdiction, (*see* doc. 29-1 at 19), the standards regarding facial attacks apply in this

19

case.[12]

In a facial attack on subject matter jurisdiction, the nonmoving party "receives the same protections as it would defending against a motion brought under [Federal Rule of Civil Procedure] 12(b)(6)." *In re Sea Vessel, Inc.*, *v. Reyes*, 23 F.3d 345, 347 (11th Cir. 1994) (quoting *Osborn v. United States*, 918 F.2d 724, 729 n.6 (8th Cir. 1990)) (internal quotation marks omitted). To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Furthermore, "[t]he plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that defendant has acted unlawfully." *Id.* (quoting *Twombly*, 550 U.S. at 556). And "[w]here a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'" *Id.* (quoting *Twombly*, 550 U.S. at 557).

Additionally, "the tenet that a court must accept as true all of the allegations contained

---

[12] Though EWTN has attached exhibits to its Opposition, the court nevertheless considers this a facial attack because "[a]lthough a court may consider materials beyond the pleadings if the defendant has mounted a factual attack on subject-matter jurisdiction, there is no suggestion in this record that the defendant has done so . . . ." *Mulhall v. UNITE HERE Local 355*, 618 F.3d 1279, 1286 n.8 (11th Cir. 2010). In addition, because this case involves matters that touch on administrative rules, guidance documents, government statements, and government studies, the court notes that it is permitted to consider matters of public record on a motion to dismiss. *Universal Express, Inc. v. U.S. S.E.C.*, 177 F. App'x 52, 53-54 (11th Cir. 2006).

20

in a complaint is inapplicable to legal conclusions," *id.*, because "[a] pleading that offers 'labels and conclusion' or 'a formulaic recitation of the elements of a cause of action will not do,'" *id.* (quoting *Twombly*, 550 U.S. at 555).  Moreover, "a complaint [will not] suffice if it tenders 'naked assertions' devoid of 'further factual enhancement.'" *Id.* (quoting *Twombly*, 550 U.S. at 557).  In other words, "conclusory allegations, unwarranted factual deductions or legal conclusions masquerading as facts will not prevent dismissal." *Davila v. Delta Air Lines, Inc.*, 326 F.3d 1183, 1185 (11th Cir. 2003) (citation omitted).

### III. DISCUSSION

Defendants argue that this court does not have jurisdiction to decide EWTN's claims (1) because EWTN lacks standing and (2) because its claims are not ripe, since the regulation that it challenges is in the process of being amended.  The court will address these arguments in turn.  First, however, it is worth briefly discussing the numerous federal opinions that have already been issued considering these very arguments.

### A.  Federal Cases Reviewing Challenges to the Mandate

After the issuance of the Mandate, several lawsuits were filed in federal courts throughout the country by religious organizations challenging its enactment (in most cases, based on the same or similar grounds to EWTN in this case).  To date, at least eighteen opinions directly on point—namely, those involving religious not-for-profit employers who would not qualify under the religious employer exemption as defined in the interim final

rules and later finalized—have been issued.[13]  *See Wheaton Coll. v. Sebelius*, 703 F.3d 551 (D.C. Cir. 2012); *Geneva Coll. v. Sebelius*, 2:12-CV-00207, 2013 WL 838238 (W.D. Pa. Mar. 6, 2013); *Roman Catholic Diocese of Dallas v. Sebelius*, 3:12-CV-1589-B, 2013 WL 687080 (N.D. Tex. Feb. 26, 2013); *Conlon v. Sebelius*, 12-CV-3932, 2013 WL 500835 (N.D. Ill. Feb. 8, 2013); *Roman Catholic Diocese of Fort Worth v. Sebelius,* No. 4:12–CV–314–Y (N.D. Tex. Jan. 31, 2013); *Archdiocese of St. Louis v. Sebelius*, 4:12-CV-00924-JAR, 2013 WL 328926 (E.D. Mo. Jan. 29, 2013); *Roman Catholic Archbishop of Washington v. Sebelius*, CIV.A. 12-0815 ABJ, 2013 WL 285599 (D.D.C. Jan. 25, 2013); *Persico v. Sebelius*, 1:12-CV-123-SJM, 2013 WL 228200 (W.D. Pa. Jan. 22, 2013); *Colorado Christian Univ. v. Sebelius*, No. 11-CV-03350-CMA-BNB, 2013 WL 93188 (D. Colo. Jan. 7, 2013); *Catholic Diocese of Peoria v. Sebelius*, 12-1276, 2013 WL 74240 (C.D. Ill. Jan. 4, 2013); *Univ. of Notre Dame v. Sebelius*, 3:12CV253RLM, 2012 WL 6756332 (N.D. Ind. Dec. 31, 2012); *Catholic Diocese of Biloxi, Inc. v. Sebelius*, 1:12CV158-HSO-RHW, 2012 WL 6831407 (S.D. Miss. Dec. 20, 2012); *Roman Catholic Archdiocese of New York v. Sebelius*, 12 CIV. 2542 BMC, 2012 WL 6042864 (E.D.N.Y. Dec. 4, 2012); *Zubik v. Sebelius*, 2:12-CV-00676, 2012 WL 5932977 (W.D. Pa. Nov. 27, 2012); *Catholic Diocese of Nashville v.*

---

[13]  In addition, several opinions in cases that are similar, but not completely factually analogous have been issued.  *See, e.g.*, *Hobby Lobby Stores, Inc. v. Sebelius*, 870 F. Supp. 2d 1278 (W.D. Okla. 2012) (involving a for-profit corporation that could not qualify for the safe harbor); *Legatus v. Sebelius*, 12-12061, 2012 WL 5359630 (E.D. Mich. Oct. 31, 2012) (same); *Tyndale House Publishers, Inc. v. Sebelius*, CIV.A. 12-1635 RBW, 2012 WL 5817323 (D.D.C. Nov. 16, 2012) (same); *Newland v. Sebelius*, 881 F. Supp. 2d 1287 (D. Colo. 2012) (same).

*Sebelius*, 3-12-0934, 2012 WL 5879796 (M.D. Tenn. Nov. 21, 2012); *Wheaton Coll. v. Sebelius*, 887 F. Supp. 2d 102 (D.D.C. 2012) *rev'd in part*, 703 F.3d 551 (D.C. Cir. 2012); *Belmont Abbey Coll. v. Sebelius*, 878 F. Supp. 2d 25 (D.D.C. 2012) *rev'd in part*, 703 F.3d 551 (D.C. Cir. 2012); *Nebraska ex rel. Bruning v. U.S. Dept. of Health & Human Services*, 877 F. Supp. 2d 777 (D. Neb. 2012).  Of these, only one has been a circuit court opinion.  *See Wheaton Coll.*, 703 F.3d at 551.

In *Wheaton College v. Sebelius*, 703 F.3d 551 (D.C. Cir. 2012), the D.C. Circuit consolidated an expedited appeal from the United States District Court for the District of Columbia in two of the earliest decisions to emerge on this issue: *Belmont Abbey College v. Sebelius*, 878 F. Supp. 2d 25 (D.D.C. 2012) *rev'd in part*, 703 F.3d 551 (D.C. Cir. 2012), and *Wheaton College v. Sebelius*, 887 F. Supp. 2d 102 (D.D.C. 2012) *rev'd in part*, 703 F.3d 551 (D.C. Cir. 2012).  These two cases, which were filed on November 10, 2011, *see Belmont Abbey Coll.*, 878 F. Supp. at 29, and July 18, 2012, *see Wheaton Coll.*, 887 F. Supp. 2d at 104, each held that the respective plaintiff lacked standing and that the suit was not ripe for review.  *See Belmont Abbey Coll.*, 878 F. Supp. at 29; *Wheaton Coll.*, 887 F. Supp. 2d at 104. Many later opinions followed suit, adopting similar reasoning.  *See, e.g.*, *Univ. of Notre Dame*, 2012 WL 6756332, at *4; *Zubik*, 2:12-CV-00676, 2012 WL 5932977, at *10, *12; *Catholic Diocese of Nashville*, 2012 WL 5879796, at *4, *5.  However, upon review of *Wheaton College* and *Belmont Abbey*, the D.C. Circuit held in a three-page per curiam Order that "[d]ismissal for lack of standing was erroneous because standing is assessed at the time

of filing, and the colleges clearly had standing when these suits were filed.  The ripeness question is more difficult." *Wheaton Coll.*, 703 F.3d at 552 (citing *Chamber of Commerce v. EPA*, 642 F.3d 192, 200 (D.C. Cir. 2011)).  The court then determined that the case was not ripe for review but decided to hold it in abeyance until the government issued a new rule. *Id.* at 552-53.

As a consequence of the D.C. Circuit's opinion, many subsequent district court opinions chose to dismiss similar cases for lack of ripeness, but chose not to decide the question of standing.  *See, e.g.*, *Roman Catholic Archbishop of Washington*, 2013 WL 285599, at *4; *Persico v. Sebelius*, 1:12-CV-123-SJM, 2013 WL 228200, at *21; *Colorado Christian Univ.*, 2013 WL 93188, at *9; *Catholic Diocese of Peoria*, 2013 WL 74240, at *4-5; *Catholic Diocese of Biloxi, Inc.*, 2012 WL 6831407, at *6.  Further, only two courts to this point have found both standing and ripeness present, allowing the cases in front of them to move forward, *see Roman Catholic Diocese of Fort Worth*, No. 4:12–CV–314–Y, at *12 (N.D. Tex. Jan. 31, 2013); *Roman Catholic Archdiocese of New York v. Sebelius*, 2012 WL 6042864, *15, *22-23.  Finally, two of the most recent district court cases, much like the D.C. Circuit, have both found standing, but each has dismissed the case before it for lack of ripeness.  *See Geneva Coll. v. Sebelius*, 2013 WL 838238, *12, *16; *Roman Catholic Diocese of Dallas*, 2013 WL 687080, *12, *17.  These are the only two courts that have issued opinions since the NPRM was published on February 1, 2012.

### B. Standing

Article III of the Constitution limits the power of the federal judiciary to the resolution of "Cases" and "Controversies." U.S. Const. art. III. § 2, cl. 1; *see also Allen v. Wright*, 468 U.S. 737, 750 (1984) (discussing the case-or-controversy requirement). This limitation "defines with respect to the Judicial Branch the idea of separation of powers on which the Federal Government is founded." *Allen*, 468 U.S. at 750. Standing "is an essential and unchanging part of the case-or-controversy requirement of Article III." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992) (citation omitted). It "requires federal courts to satisfy themselves that 'the plaintiff has alleged such a personal stake in the outcome of the controversy as to warrant [its] invocation of federal-court jurisdiction.'" *Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009) (quoting *Warth v. Seldin*, 422 U.S. 490, 498-99 (1975)). In that vein, standing fundamentally focuses "on the party seeking to get his complaint before the federal court rather than 'on the issues he wishes to have adjudicated.'" *United States v. Richardson*, 418 U.S. 166, 174 (1974) (quoting *Flast v. Cohen*, 392 U.S. 83, 99 (1968)).

At its "irreducible constitutional minimum," the doctrine requires a plaintiff to prove three elements: (1) a concrete and imminent injury-in-fact, (2) causal relationship between the injury and defendants' challenged conduct, and (3) a likelihood that the injury suffered will be redressed by a favorable decision. *See Lujan*, 504 U.S. at 560-61; *see also Allen*, 468 U.S. at 751 ("A plaintiff must allege personal injury fairly traceable to the defendant's

allegedly unlawful conduct and likely to be redressed by the requested relief." (citing *Valley Forge Christian Coll. v. Ams. United for Separation of Church and State, Inc.*, 454 U.S. 464, 472 (1982))).  The injury in fact must also be "an invasion of a legally protected interest." *Lujan*, 504 U.S. at 560 (citations omitted).

Particularly relevant to this case is the "injury-in-fact" element.  A threat of injury "must be *certainly impending* to constitute injury in fact."  *Clapper v. Amnesty Int'l USA*, 133 S. Ct. 1138, 1147 (2013)[14] (emphasis in original) (quoting *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990)) (internal quotation marks omitted); *see also Koziara v. City of Casselberry*, 392 F.3d 1302, 1306 (11th Cir. 2004) (requiring plaintiffs to show a "real and immediate threat of future injury" when seeking declaratory and injunctive relief).  Though there is no precise definition, imminence requires that "the injury proceed with a high degree of immediacy, so as to reduce the possibility of deciding a case in which no injury would have occurred at all."  *Lujan*, 504 U.S. at 564 n.2 (citations omitted).  However, "imminence is concededly a somewhat elastic concept, [and though] it cannot be stretched beyond its purpose, which is to ensure that the alleged injury is not too speculative for Article III purposes," *Clapper*, 133 S. Ct. at 1147 (quoting *Lujan*, 504 U.S. at 565), "one does not have to await the consummation of threatened injury to obtain preventive relief.  If the injury is

---

[14]  *Clapper v. Amnesty Int'l USA*, 133 S. Ct. 1138, 1147 (2013), a recent United States Supreme Court case pointed out by defendants in a Notice of Supplemental Authority, (*see* doc. 77), reiterates a point that the Court has repeatedly made regarding standing: namely, that "allegations of *possible* future injury" are not sufficient to confer standing.  *Clapper*, 133 S. Ct. at 1147 (quoting *Whitmore*, 495 U.S. at 158).

26

certainly impending, that is enough," *Babbitt v. UFW Nat'l Union*, 442 U.S. 289, 298 (1979) (citations omitted).

Finally, standing and ripeness tend to overlap significantly in the context of pre-enforcement challenges to laws and regulations. *See ACLU v. Fla. Bar*, 999 F.2d 1486, 1490 (11th Cir. 1993). Although the overlap often causes the issues to merge, the court "discuss[es] standing and ripeness separately." *Elend v. Basham*, 471 F.3d 1199, 1205 (11th Cir. 2006). This is because, despite the overlap, there are differences between the doctrines. One crucial difference between ripeness and standing is that "the standing inquiry remains focused on whether the party invoking jurisdiction had the requisite stake in the outcome *when the suit was filed*." *Davis v. Fed. Election Comm'n*, 554 U.S. 724, 734 (2008) (emphasis added) (citing *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180 (2000); *Arizonans for Official English v. Arizona*, 520 U.S. 43, 68 n.22 (1997)); *see also Am. Civil Liberties Union of Fla., Inc. v. Dixie Cnty., Fla.*, 690 F.3d 1244, 1257 n.5 (11th Cir. 2012) ("For jurisdiction, standing had to exist when the suit was filed (not arise later). . . . It is not enough for Plaintiff to try to establish, in terms of shifting reality, the requirements of standing as the case progresses through the federal courts." (internal citation omitted)).[15]

---

[15] Quite different from standing, which a party always possesses once it is established, "ripeness can be affected by events occurring after the case is filed," *Yacht Club on the Intracoastal Condo. Ass'n v. Lexington Ins. Co.*, 11-15683, 2013 WL 598389, *3 (11th Cir. Feb. 15, 2013), and thus may be gained or lost throughout a case.

Defendants contend that EWTN cannot pass the first hurdle in the standing analysis—specifically, defendants do not believe that EWTN has suffered a concrete and imminent injury-in-fact. To satisfy this first prong, EWTN must establish that it will suffer "an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical." *Lujan*, 504 U.S. at 560 (internal quotation marks and citations omitted). A threatened injury must be "certainly impending" to confer standing; harm that is possible or even likely will not suffice. *Whitmore*, 495 U.S. at 158 (internal quotation marks and citations omitted).

While defendants make good points, as the D.C. Circuit noted in *Wheaton College*, "standing is assessed at the time of filing." 703 F.3d at 552. Here, EWTN originally filed suit on February 9, 2012. (*See* doc. 1.) At that time, there can be no question that EWTN had standing: only the amended interim final rules, which were clearly binding and imposed concrete future obligations on EWTN, had at that point been issued. *See* 76 Fed. Reg. at 46,625, 46,626 (discussing the "*binding* comprehensive health plan coverage guidelines" (emphasis added)); *see also Appalachian Power Co. v. E.P.A.*, 208 F.3d 1015, 1020 (D.C. Cir. 2000) (explaining that legislative rules "have the force and effect of law"); *Humane Soc. of U.S. v. Johanns*, 520 F. Supp. 2d 8, 30 (D.D.C. 2007) (treating interim final rule as binding because it "create[d] an entirely new regulatory structure" and vacating it on that basis). Thus, the question of standing at the time that the original Complaint was filed is a simple one to answer. Because the amended interim final rules, as the law in effect at the time, were

"certainly impending" *Clapper*, 133 S.Ct. at 1147, EWTN had a "real and immediate threat of future injury," *Koziara*, 392 F.3d at 1306, and therefore had standing.  *See Geneva Coll.*, 2013 WL 838238, at *11 ("The subsequent events and assurances upon which defendants heavily rely . . . do not remove Geneva's standing as measured at the time this case was filed in February 2012."); *Wheaton Coll.*, 703 F.3d at 552 (holding Belmont Abbey College had standing at the time the complaint was filed on November 10, 2011, when amended interim final rules were in place, but the safe harbor and ANPRM had yet to be issued).

However, defendants argue that the Amended Complaint, (doc. 13), which was filed on March 21, 2012—after the safe harbor and ANPRM were issued—is the operative Complaint for the purposes of assessing standing.  (*See* doc. 36 at 7; doc. 64 at 3.)  Though it presents a more difficult question, even if the Amended Complaint operates as the relevant Complaint, the court again finds that as of the time it was filed, EWTN had standing.[16]  *See*

_____

[16]  The court notes, however, that it is not entirely convinced that the time the Amended Complaint was filed is the operative date for purposes of standing.  Though defendants observe that "[w]hen a plaintiff files a complaint in federal court and then voluntarily amends the complaint, courts look to the amended complaint to determine jurisdiction," (doc. 36 at 7 (quoting *Rockwell Int'l Corp. v. United States*, 549 U.S. 457, 473-74 (2007)), that case involved a situation where the original complaint had made allegations sufficient to confer jurisdiction and was later amended, replacing those allegations with ones that were insufficient to confer jurisdiction.  *Rockwell Int'l Corp.*, 549 U.S. at 463-76.  And though the *allegations* in the second complaint controlled, the court reiterated that subject-matter jurisdiction depends on the actual state of things at the time the action is brought.  *Id.* at 473.  Moreover, as noted earlier, here, EWTN's Amended Complaint only adds a few paragraphs to its Complaint; the twelve original claims remain the same.  (*See* doc. 13 ¶¶ 86-93, 115-17, 118-205.)  Certainly, were EWTN to add new claims, standing for those claims would be assessed as of March 21, 2012.  But EWTN adds only a few new facts based upon later developments in this case.  And while adding later-developed facts could also be potentially problematic because standing depends on the "state of things" when the complaint is filed, *Rockwell Int'l Corp.*, 549 U.S. at 473, here, the court

*Wheaton Coll.*, 703 F.3d at 552 (holding Wheaton College had standing at the time the complaint was filed on July 18, 2012).  To find otherwise would be to find that the development of the finalized Mandate and the issuance of the ANPRM essentially mooted the challenge to the amended interim final rules that EWTN originally brought, which it does not.  *See Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 189-92 (2000) (discussing the interaction between standing and mootness).[17]

Assuming that the date the Amended Complaint was filed is the operative date, defendants point to two elements of the regulatory history of this case to contend that EWTN lacks standing: the safe harbor and the ANPRM.  (*See* doc. 29-1 at 8-9, 23-26; doc. 36 at 3-8.)  The court will discuss below why neither of these developments operate to prevent

---

considers the amended interim final rules and the finalized Mandate—the development of which EWTN has added to its Amended Complaint—to be, in substance, the same rule.  As such, the Amended Complaint would relate back to the date of filing the original Complaint: February 9, 2012.  *See Focus on the Family v. Pinellas Suncoast Transit Auth.*, 344 F.3d 1263, 1275-76 (11th Cir. 2003) (discussing at length how standing is determined at the time the complaint is filed, and noting that because the second complaint contained the same allegations as original complaint, it related back under Federal Rule of Civil Procedure 15(c)(2) for standing purposes); *see also Geneva Coll.*, 2013 WL 838238, at *11-12 (using original complaint filed in February 2012, as opposed to amended complaint, for purposes of assessing standing).

[17]  The court realizes that *Friends of the Earth, Inc. v. Laidlaw*, 528 U.S. 167 (2000), discusses how the Supreme Court's prior statements that "mootness [i]s 'standing set in a time frame'" were not comprehensive.  *Id.* at 190.  The Supreme Court noted that there might be certain instances where a case is not yet moot, but it would be too speculative to confer standing.  *Id.*  However, there is still significant overlap between the two doctrines, and while the ANPRM's existence at the time of filing the Amended Complaint indicated that EWTN's challenge might have someday become moot, it in no way approached satisfying the extremely high bar that mootness requires.  *See id.* (explaining the "formidable burden" to show mootness).  Thus, the court cannot say that when EWTN filed its Amended Complaint on March 21, 2012, its harms were too speculative to confer standing.

EWTN's standing at the time of filing its Amended Complaint.

### 1. The Safe Harbor

Defendants argue that, under the safe harbor, they will not take action against any qualifying organization until the first plan year that begins on or after August 1, 2013. (Doc. 29-1 at 23-24.)  Given that EWTN's plan year begins on July 1 each year, (doc. 13, ¶ 32), the Mandate would not be enforced against it until July 1, 2014.  Defendants argue that "[w]ith such a long time before the inception of any possible injury and the challenged regulations undergoing amendment before then, plaintiff cannot satisfy the imminence requirement for standing . . . ."  (Doc. 29-1 at 24.)  EWTN acknowledges that it falls within the safe harbor. (*See* doc. 13 ¶ 93).  Notwithstanding application of the safe harbor, EWTN argues that "[w]here the inevitability of the operation of a statute against certain individuals is patent, it is *irrelevant* . . . that there will be a time delay before the disputed provisions will come into effect."  (Doc. 33 at 16 (alterations in original) (quoting *Reg'l Rail Reorg. Act Cases*, 419 U.S. 102, 143 (1974)) (internal quotation marks omitted).)  EWTN additionally cites *New York v. United States*, 505 U.S. 144 (1992), and *Pierce v. Society of Sisters*, 268 U.S. 510 (1925), to show that the Supreme Court has held enforcement delays varying from three to six years insufficient to deny a plaintiff's standing.  (Doc. 33 at 17.)

The court finds that the law favors EWTN.  The safe harbor will end on a definite date.  At that point, the Mandate will take effect against non-grandfathered and non-exempt organizations' group health plans absent a change in the regulatory scheme.  Moreover, the

time delay will be approximately two years, a relatively short period of time in the context of Supreme Court jurisprudence regarding standing. *See New York*, 505 U.S. at 153-54, 174-75 (three-year delay); *Pierce*, 268 U.S. at 530-36 (1925) (several year delay).  Tellingly, defendants impliedly concede this point, citing to Eleventh Circuit precedent and acknowledging that "the mere passage of time alone may not defeat standing."  (Doc. 29-1 at 24 (citing *Fla. State Conf. of NAACP v. Browning*, 522 F.3d 1153, 1161 (11th Cir. 2008)).) And, as EWTN correctly points out, (doc. 33 at 18), as a general rule, policies of non-enforcement do not deprive a plaintiff of standing.  *See Va. Soc'y for Human Life, Inc. v. Fed. Election Comm'n*, 263 F.3d 379, 388 (4th Cir. 2001) (holding that a non-enforcement policy "not contained in a final rule . . . . [and] not carry[ing] the binding force of law" cannot defeat standing).  Accordingly, the court finds that the safe harbor, by itself, does not defeat EWTN's standing.  Given this finding, the court need not address the parties' conflicting interpretations of *Fla. ex. rel. Att'y Gen. v. HHS*, 648 F.3d 1235 (11th Cir. 2011).[18]

---

[18]  EWTN cites *Fla. ex. rel. McCollum*, 716 F. Supp. 2d 1120, 1145-46 (N.D. Fla. 2010), to support its argument that the two-year gap between filing its Complaint and enforcement of the Mandate does not destroy standing.  (Doc. 33 at 17.)  Defendants argue that EWTN impliedly contends that, because the defendants in *McCollum* conceded standing upon appeal to the Eleventh Circuit, *Fla. Ex rel. Att'y Gen.*, 648 F.3d at 1243, the defendants in this case—who significantly overlap with the defendants in that case—should be forestalled from challenging standing.  (Doc. 36 at 4, 4 n.4.)  Defendants are right to point out that such non-mutual offensive collateral estoppel does not apply against the government.  *See United States v. Mendoza*, 464 U.S. 154, 162 (1984); (doc. 36 at 4, 4 n.4.)  However, the court does not necessarily agree that EWTN cited to *McCollum* for that purpose.  Rather, the court sees EWTN's citation as additional support for the proposition that a two-year enforcement gap does not defeat standing.

### 2. The ANPRM

Just as the safe harbor does not prevent an actual and imminent injury to EWTN, neither does the ANPRM.  Defendants' argument regarding the ANPRM is based on Eleventh Circuit and Supreme Court precedent "requir[ing] that 'the injury proceed with a high degree of immediacy, so as to reduce the possibility of deciding a case in which no injury would have occurred at all.'"  *Alabama-Tombigbee Rivers Coal. v. Norton*, 338 F.3d 1244, 1253 (11th Cir. 2003) (quoting *Lujan*, 504 U.S. at 564 n.2).  Specifically, defendants contend that by operation of the ANPRM, EWTN will not endure injury as a result of the Mandate:

> In light of the forthcoming amendments, and the opportunity the rulemaking process provides for [EWTN] to help shape those amendments, there is no basis to conclude that [EWTN] will be, or is likely to be, required to sponsor a health plan that covers contraceptive services in contravention of its religious beliefs once the . . . safe harbor expires.

(Doc. 29-1 at 25-26.) EWTN counters that defendants' arguments actually address mootness and, under that guise, fail.  (Doc. 33 at 19-20.)  It further argues that because defendants have not amended the Mandate, but have only offered "statements of future . . . intentions," the current Mandate's impending harm is not speculative.  (*Id.* at 18, 20.)  Finally, EWTN contends that even if the ANPRM were implemented exactly as planned, it still would not

---

Regardless, the court in no way permits non-mutual offensive collateral estoppel against defendants based on *McCollum*, nor does it find it necessary to consider its holding regarding the two-year delay, given that EWTN has presented ample authority to prove its point without the support of *McCollum*.

alleviate its injuries.  (*Id.* at 22-23.)  The court agrees with EWTN that the ANPRM does not operate to undermine its injury in fact.

Even using the Amended Complaint, (doc. 13), as the operative complaint for purposes of measuring standing, the court finds that as of March 21, 2012, EWTN possessed standing to file suit.  As discussed earlier, standing is measured at the time of filing.  *See Davis*, 554 U.S. at 734.  Thus, it is at this moment in time that the standing requirement operates, attempting to avoid the issuance of what amounts to an advisory opinion.  *See United Pub. Workers of Am. (C.I.O.) v. Mitchell*, 330 U.S. 75, 89 (1947) (stating that federal courts do not issue advisory opinions on abstract issues).  Here, though defendants assert that the ANPRM creates a case in which there is "no basis to conclude" that EWTN will be injured, so that there is no case or controversy, the court disagrees.  At the time of filing, "the mandate [wa]s the current law, notwithstanding defendants' assurances that its requirements will eventually be changed."  *Geneva Coll.*, 2013 WL 838238, at *11.  As the law in effect at the time of filing, it had a direct and immediate impact upon EWTN, regardless of the safe harbor or the fact that a new rulemaking process had been initiated.

It is true that the ANPRM launched an amendment *process* to the Mandate.  *See generally* 77 Fed. Reg. at 16,501-08.  The name itself—advance notice of proposed rulemaking—illustrates this fact.  However, nowhere in the ANPRM did defendants "promise" that a change would absolutely, unequivocally take place.  *See id.*  Though the ANPRM repeatedly refers to the agencies' "intention" to amend the rules, there was no

concrete assurance at the time EWTN had filed suit that the rules would not bind it or that they would "never be enforced in their present form by defendants against [EWTN]." (Doc. 61 at 6.); *see also.* 77 Fed. Reg. at 16,501 ("This advance notice of proposed rulemaking announces the *intention* of the [agencies] to propose amendments to [the] regulations . . . ." (emphasis added)); *id.* at 16,503 ("The Departments *intend* to finalize these amendments to the final regulations such that they are effective by the end of the temporary enforcement safe harbor . . . ." (emphasis added)).[19]   Accordingly, the court agrees with EWTN that defendants' argument "ultimately amounts to a prediction that the unforeseeable results of a speculative proposed rulemaking might, sometime in the future, remove EWTN's injury . . . . [but] cannot change the fact that EWTN faces the real prospect of harm from a concrete regulatory mandate . . . ." (Doc. 33 at 23.)[20]

---

[19]   Defendants acknowledge this at one point by stating that "[t]he ANPRM published in the Federal Register confirms defendants' stated *intention* to propose amendments to the preventive services coverage regulations that accommodate the concerns of religious organizations . . . ." (Doc. 29-1 at 25 (emphasis added).)  However, in other places defendants overstate their initial *intent* to make changes by declaring that through the ANPRM they had "promis[ed] imminent regulatory amendments," (*id.* at 24), had "promised new regulations" (*id.* at 26), had "done more than merely promise a future rulemaking," (doc. 36 at 4 n.3), had made a "commitment . . . to amend the regulations," (*id.* at 8).  It was only later, in Defendants' Response to Plaintiff's Third Notice of Supplemental Authority, that defendants outright declared that "defendants will *never* enforce the regulations in their current form against . . . plaintiff," (doc. 61 at 3 (emphasis in original)), rather than simply framing their past statements of intention as promises.  Accordingly, at the time EWTN filed suit, no "promises" had been made.

[20]   To support this assertion, EWTN cites to *Thomas More Law Ctr. v. Obama*, 651 F.3d 529, 536 (6th Cir. 2011), *rev'd on other grounds*, *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 132 S. Ct. 2566 (2012), for the proposition that "[i]mminence is a function of probability" and that the ANPRM and its effects are far too speculative to defeat standing.  (Doc. 33 at 24.)  Further, to

In a recent decision from the District Court for the Northern District of Texas, *Roman Catholic Diocese of Dallas v. Sebelius*, 3:12-CV-1589-B, 2013 WL 687080 (N.D. Tex. Feb. 26, 2013), the court addressed the exact issues before this court based on a lawsuit that was filed on May 21, 2012, after the issuance of the safe harbor and the ANPRM. *See id.* at *5. The court held that the plaintiff, a nonprofit charitable organization existing under the Code of Canon Law of the Roman Catholic Church, had demonstrated standing at the time the suit was filed. *Id.* at *11-12. It reasoned that

> publication of the ANPRM is insufficient to undermine the imminence of Plaintiff's alleged injuries. The ANPRM merely states that the government expects to address concerns similar to those raised by Plaintiff and solicits comment on the same. 77 Fed. Reg. 16,501. The ANPRM is not a proposed amendment and does not proffer contents or substance of a proposed amendment. There is no concrete evidence to indicate that the government is reversing its course. *See API v. EPA*, 683 F.3d 382, 388 (D.C. Cir. 2012). Although the Court cannot say that every ANPRM would be insufficient to indicate a shift in administrative policy, the ANPRM relevant to this case provides no specifics to quash Plaintiff's fear of enforcement or to disprove the imminence of Plaintiff's injury upon enforcement of the current, final regulations.

*Id.* at *9. A similar rationale was set forth in *Roman Catholic Archdiocese of New York v. Sebelius*, 12 CIV. 2542 BMC, 2012 WL 6042864 (E.D.N.Y. Dec. 4, 2012), where the court

---

demonstrate that the ANPRM shows mere *intent* to amend the Mandate, EWTN cites to *American Petroleum Institute v. EPA*, 906 F.2d 729, 739-40 (D.C. Cir. 1990), which observes that "an agency *always* retains the power to revise a final rule . . . . [and i]f the possibility of unforseen amendments were sufficient to [destroy justiciability], review could be deferred indefinitely." (*Id.* at 20.) Finally, EWTN cites *American Bird Conservancy, Inc. v. FCC*, 516 F.3d 1027, 1031 n.1 (D.C. Cir. 2008) (per curiam), to similarly show that "agencies cannot avoid judicial review . . . merely because they have opened another docket that may address some related matters." (*Id.*) As discussed above, the court finds EWTN's arguments on this matter persuasive.

stated

> the ANPRM is not a formally announced change[ ] to official government policy. Despite defendants' attempt to characterize the ANPRM as a binding promise not to enforce the Coverage Mandate, the fact is that the ANPRM does not prevent the Coverage Mandate, as it currently exists, from going into effect. It is not a change in policy; it merely seeks input to allow the Departments to consider possible revisions to the Coverage Mandate. The Departments need not make any changes to the Coverage Mandate to accommodate religious groups at all.

> In this light, the Court finds that plaintiffs' claimed future injuries are certainly impending. The law as it currently [is] written requires that, beginning January 1, 2014, plaintiffs must either pay onerous fines or provide contraceptive coverage in violation of their beliefs. The Departments may alter the Coverage Mandate before that time, but the possibility of a change in the law does not mean that a requirement that will become effective by operation of law is not certainly impending. Thus, plaintiffs' future injuries are sufficiently imminent to constitute injuries in fact.

*Id.* at *15 (internal quotation marks and citations omitted). The court agrees with the rationale of both *Roman Catholic Diocese of Dallas* and *Roman Catholic Archdiocese of New York*. Thus, even if the court were to assess standing as of the time of EWTN's Amended Complaint, (doc. 13), the safe harbor and the ANPRM do not operate to make EWTN's injuries *at the time of filing* any less concrete or imminent. Accordingly, the court finds that EWTN has standing to challenge the Mandate.[21]

---

[21] It is worth noting that because the NPRM was issued after both EWTN's original Complaint, (doc. 1), and Amended Complaint, (doc. 13), it "has no bearing on whether [EWTN] adequately alleged its standing to sue," *Roman Catholic Diocese of Dallas*, 2013 WL 687080, *11. Therefore, to the extent that defendants argue the issuance of the NPRM affects EWTN's standing, (*see* doc. 74 at 3 ("[T]the NPRM further buttresses defendants' promise that they will never enforce the current version of the challenged regulations against plaintiff, further demonstrates concrete action to change those regulations, and further undermines plaintiff's

## C. Ripeness

Apart from their standing argument, defendants argue that this court lacks jurisdiction to hear EWTN's claims because the case is not ripe for review.  (Doc. 29-1 at 26.) Specifically, defendants contend that the Mandate is in the process of being amended, and that therefore, there is "a significant chance that the amendments will alleviate altogether the need for judicial review, or at least narrow and refine the scope of any actual controversy to more manageable proportions." (*Id.* at 29.)  Thus, defendants claim that EWTN's challenge is not fit for review.  (*Id.* at 32.)  Further, defendants argue that a delay in judicial review will not cause EWTN to suffer any hardship because an "alleged desire to plan for . . . contingencies" is not enough to constitute hardship under the test for determining ripeness. (Doc. 36 at 12.)  In response, EWTN argues that its claims are ripe because they present purely legal issues which require no factual development, they challenge a final rule that marks the consummation of the agency's rulemaking process, defendants' arguments address mootness as opposed to ripeness, and it will suffer hardship if review is delayed because it must "plan *now*," (doc. 33 at 30 (emphasis in original)), for the Mandate's future effects. (Doc. 33 at 24-31.)  The court agrees with defendants that the action is due to be dismissed because it is not ripe for review at this time.

The ripeness doctrine is comprised of two main questions: (1) whether the issues are

---

unfounded suggestions that the government will not follow through on its commitment.")), they are mistaken.  (*See also* doc. 75 at 3.)

fit for judicial review; and (2) whether withholding a decision will cause "hardship to the parties." *Abbott Labs. v. Garner*, 387 U.S. 136, 149 (1967).  As discussed earlier, ripeness and standing often overlap—in particular, in "cases involving pre-enforcement review, the standing and ripeness inquiries may tend to converge." *Elend*, 471 F.3d at 1205.  And like standing, ripeness is "drawn both from Article III limitations on judicial power and from prudential reasons for refusing to exercise jurisdiction." *Nat'l Park Hospitality Ass'n v. Dep't of Interior*, 538 U.S. 803, 808 (2003).  However, it is not a hard and fast rule that ripeness and standing go hand in hand: "there [still] may be standing without ripeness, . . . or there may be ripeness without standing." *Elend*, 471 F.3d at 1205.

Moreover, the doctrines have some key differences.  Ripeness differs significantly from standing in that it asks whether a case is ready (i.e., "ripe") for entertaining, while standing focuses on the parties themselves, asking whether they are the right persons to bring the suit.  *See Wilderness Soc. v. Alcock*, 83 F.3d 386, 390 (11th Cir. 1996) (discussing the intersection of standing and ripeness and noting the main difference—that while standing "asks whether these persons are the proper *parties* to bring the suit," ripeness "asks whether this is the correct *time* for the complainant to bring the action (emphasis in original)).  Further, as noted earlier, "ripeness can be affected by events occurring *after* the case is filed," *Yacht Club on the Intracoastal Condo. Ass'n v. Lexington Ins. Co.*, 11-15683, 2013 WL 598389, *3 (11th Cir. Feb. 15, 2013) (emphasis added) (citing cases), while standing either exists or does not exist at the time the suit is filed, *see Focus on the Family v. Pinellas*

39

*Suncoast Transit Auth.*, 344 F.3d 1263, 1275 (11th Cir. 2003).  *See also Blanchette v. Conn. Gen. Ins. Corps.*, 419 U.S. 102, 140 (1974) ("[R]ipeness is peculiarly a question of timing, it is the situation now rather than the situation at [an earlier time] that must govern."); *Geneva Coll.*, 2013 WL 838238, at *12 ("Unlike standing which is determined as of the time the case commenced, ripeness may consider events which have occurred after the filing of the complaint." (citing *Buckley v. Valeo*, 424 U.S. 1, 114–17 (1976))).

In addition, because ripeness, like standing, is concerned with the case and controversy requirement of Article III, *see Konikov v. Orange Cnty., Fla.*, 410 F.3d 1317, 1322 (11th Cir. 2005), it aims to avoid deciding cases which need not yet be decided, and which could eventually be resolved by the agency being challenged, thus avoiding litigation entirely, *see Belmont Abbey*, 2012 WL 2914417, at *12 ("[I]f we do not decide the issue now, we may never need to." (alterations omitted) (quoting *Nat'l Treasury Emps. Union v. United States*, 101 F.3d 1423, 1431 (D.C. Cir. 1996))).  It further "counsel[s] judicial restraint," *Nat'l Adver. Co. v. City of Miami*, 402 F.3d 1335, 1339 (11th Cir. 2005) (quoting *Digital Props., Inc. v. City of Plantation*, 121 F.3d 586, 589 (11th Cir. 1997)) (internal quotation marks omitted), in part to "protect[] the other branches from judicial meddling," *id.* ("When a court is asked to review decisions of administrative agencies, it is hornbook law that courts must exercise patience and permit the administrative agency the proper time and deference for those agencies to consider the case fully.").  Ultimately, the ripeness doctrine "prevent[s] the courts, through avoidance of premature adjudication, from entangling

themselves in abstract disagreements over administrative policies, and also . . . protect[s] the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties." *Abbott Labs.*, 387 U.S. at 148-49.

As discussed earlier, in similar challenges to the Mandate, only two out of at least eighteen cases have found the claims ripe for review. *See Roman Catholic Diocese of Fort Worth*, No. 4:12–CV–314–Y, at *12; *Roman Catholic Archdiocese of New York v. Sebelius*, 2012 WL 6042864, *21-23. This court agrees with the reasoning of the majority of cases on the issue and finds that, given the current state of the administrative process, EWTN's claims are not ripe because they are not fit for review and EWTN will not suffer hardship sufficient to weigh the balance in favor of judicial review.

### 1. Fitness for Review

In evaluating ripeness under its two-part test, the Supreme Court has set forth factors to consider: "(1) whether delayed review would cause hardship to the plaintiffs; (2) whether judicial intervention would inappropriately interfere with further administrative action; and (3) whether the courts would benefit from further factual development of the issues presented." *Ohio Forestry Ass'n v. Sierra Club*, 523 U.S. 726, 733 (1998). Both of the latter considerations relate to whether a plaintiff's claims are fit for review. *Pittman v. Cole*, 267 F.3d 1269, 1278 (11th Cir. 2001). Other factors to weigh in considering whether a plaintiff's claims are fit include "questions of finality, definiteness, and the extent to which resolution

of the challenge depends upon facts that may not yet be sufficiently developed." *Mulhall v. UNITE HERE Local 355*, 618 F.3d 1279, 1291 (11th Cir. 2010) (quoting *Harrell v. The Fla. Bar*, 608 F.3d 1241, 1258 (11th Cir. 2010)) (internal quotation marks omitted).  Finally, "claims are less likely to be considered fit . . . when they venture beyond purely legal issues[,] . . . when they require speculation about contingent future events[, or when they] . . . . interfere[] with an agency's decisionmaking process before it has the opportunity to finalize its policies . . . ." *Pittman*, 267 F.3d at 1278 (internal quotation marks and citations omitted).

Here, although the ANPRM did not operate to deprive EWTN of standing to challenge the law that it was directly subject to at the time of filing its Complaint, it does, along with the NPRM, operate to make the Mandate unfit for review.  As noted above, there are a number of considerations that may be taken into account when considering whether a law or regulation is fit for judicial review.  In this case, one particular concern weighs heavily in favor of deferring review: that is, the fact that the agency is in the middle of a rulemaking process which might altogether alleviate the alleged harm, or at the very least narrow the issues involved, making the eventual resolution of the lawsuit better tailored and much more efficient.  *See Am. Petroleum Inst. v. E.P.A.*, 683 F.3d 382, 387 (D.C. Cir. 2012) ("[P]ermitting the administrative process to reach its end can at least solidify or simplify the factual context and narrow the legal issues at play, allowing for more intelligent resolution of any remaining claims and avoiding inefficient and unnecessary piecemeal review."

42

(internal quotation marks omitted)).  Thus, judicial review at this point—particularly where the NPRM has been issued and a new rule is set to emerge shortly—would inappropriately interfere in the "agency's decisionmaking process before it has the opportunity to finalize its policies."  *Pittman*, 267 F.3d at 1278.

Moreover, other courts have found the government's representations that it will not enforce the present rule and that a new rule *will* be issued before the end of the enforcement safe harbor persuasive.[22]  *See, e.g.*, *Wheaton Coll.*, 703 F.3d at 552 (taking the government at its word that it would "*never* enforce [the Mandate] in its current form" and that it would "issue a new Final Rule before August 2013" because waiting for the new rule could resolve the issues); *Catholic Diocese of Peoria*, 2013 WL 74240, at *5 (taking government at its word and stating that reviewing the Mandate "before it is amended and before it is to be enforced" would "undermine the interests of judicial economy").  This court agrees with the reasoning of these cases.  Accordingly, because defendants "have initiated a rulemaking specifically intended to amend the challenged regulations to address the concerns raised by organizations like [EWTN]," (doc. 36 at 6 n.7), the case is not presently fit for review.[23]

----

[22]  As noted earlier, these representations came too late to affect EWTN's standing in this case.

[23]  In response to this, EWTN claims that defendants' arguments against ripeness are, in reality, about mootness, (doc. 33 at 29), and further argues that its claims would not be undermined by mootness in any event because "[t]he ANPRM promises *no* change to th[e] status quo," (*id.* at 27), and "the NPRM confirms that EWTN will *not* be exempt from the Mandate," (doc. 75 at 3).  First, the court agrees that EWTN's claims are not moot because, as mentioned earlier, a high bar must be met in order to moot a claim.  *See Friends of the Earth, Inc.*, 528 U.S.

Reinforcing this conclusion is the fact that yet another factor, lack of finality, weighs in favor of finding the challenge unripe.  While it might seem odd to say that EWTN had standing to challenge the Mandate when it filed suit, but the Mandate currently lacks finality, that is the practical result in this case as the administrative rulemaking process progresses. Though the Mandate is the current state of the law and was binding on EWTN when it filed its Complaint, the NPRM "illustrate[s] that the challenged regulations are simply interlocutory."  *Roman Catholic Diocese of Dallas*, 2013 WL 687080, at *15; *see also Archdiocese of St. Louis*, 2013 WL 328926, at *5 ("Because the regulations are in the process of being amended, in their current form they represent a tentative as opposed to final agency position."); *Univ. of Notre Dame*, 2012 WL 6756332, at *3 ("[T]he challenged regulatory requirement isn't sufficiently final.  Notre Dame is correct that [the] regulation itself claims

---

at 190.  But second, the court also agrees with defendants that its arguments are not, in fact, about mootness.  (*See* doc. 36 at 6, 6 n.7.)  Rather, despite plaintiff's contentions, they remain fundamentally about ripeness (and standing).  (*See id.*)  Certainly, potential mootness is a relevant consideration when assessing ripeness in this case because it underscores the fact that the rules currently being developed could ultimately resolve the contested issues.  *See Efron By & Through Efron v. United States*, 1 F. Supp. 2d 1468, 1470 (S.D. Fla. 1998) *aff'd sub nom. Efron v. United States*, 189 F.3d 482 (11th Cir. 1999) (stating that there is "an additional, unspoken element of the ripeness doctrine": the idea that "if we do not need to decide it now, we may never need to").  Because ripeness is about whether issues are ready for review, it is only logical to reason that in some cases involving ongoing agency action or rulemaking that is not yet final, later developments will indeed moot the issues.  *See, e.g.*, *In re Aiken County*, 645 F.3d 428, 435-36 (D.C. Cir. 2011) (taking into account potential future mootness of claims in determining whether agency action was fit for review under a ripeness analysis); *Belmont Abbey*, 2012 WL 2914417, at *12 ("[I]f we do not decide the issue now, we may never need to." (quoting *Nat'l Treasury Emps. Union v. United States*, 101 F.3d 1423, 1431 (D.C. Cir. 1996))).  This is the case even despite EWTN's protests that no future developments could possibly impact its constitutional claims.  (Doc. 33 at 27).  Because the rule is currently in the process of being amended, EWTN must wait until its allegation becomes a reality.

to be final, but events following the regulation's adoption make clear that it isn't final."

(internal citations omitted)).  As discussed earlier, unlike standing, ripeness may come and

go throughout the course of a litigation.  *Yacht Club on the Intracoastal Condo. Ass'n*, 2013

WL 598389, at *3.  Thus, after the government's eventual promises to finalize changes to the

Mandate and to forego enforcement in its current form, (*see* doc. 61 at 6, 6 n.4), and the

issuance of the NPRM, which sets forth specifics regarding future changes, *see generally* 78

Fed. Reg. 8456, the Mandate's fundamental nature has transformed into that of a temporary

rule.  *See Conlon*, 2013 WL 500835, *at 5 ("[T]he promised accommodations regarding

religious objections mean the current regulations are not truly final, rendering any judicial

decision as to the legality of the current regulations premature.").

   Primarily for these two reasons—namely, (1) avoiding any interference with the

ongoing rulemaking process before defendants have finalized their policies, and (2) the

temporary nature of the current rules—the court finds that EWTN's claims are not ripe for

review.[24]  Nevertheless, to briefly address EWTN's claim that ripeness requirements are more

---

   [24] Whether the question to be resolved presents purely legal issues is yet another of the
factors courts look at when assessing ripeness.  *See La. Envtl. Action Network v. EPA*, 172 F.3d
65, 69 (D.C. Cir. 1999) (quoting *George E. Warren Corp. v. EPA*, 159 F.3d 616, 622 (D.C. Cir.
1998).  The parties agree that EWTN's claims present primarily legal (as opposed to factual)
issues, (*see* doc. 29-1 at 31; doc. 33 at 8, 25-26; doc. 36 at 9), however, "an agency's [actions]
do[] not become final merely because the challenger attacks the agency's jurisdiction, even where
the attack raises a pure question of law," *Ticor Title Ins. Co. v. F.T.C.*, 814 F.2d 731, 747 (D.C.
Cir. 1987).  *See also Pub. Citizen v. Office of U.S. Trade Representatives*, 970 F.2d 916, 921
(D.C. Cir. 1992) ("Even if only purely legal issues remained . . . that would not obviate the need
for finality itself.  Nor, indeed, would it establish the fitness of the issues for judicial decision, . .
. ." (internal quotation marks and citations omitted)).  Thus, even if the issues presented are

relaxed in First Amendment cases, (doc. 33 at 13, 25, 27), the court finds that even if the relaxed standard were to apply, this alone could not overcome the lack of fitness for judicial review.  While the court agrees that EWTN's observation is an accurate one, the ripeness requirement "may not be ignored" because of the less stringent standard.  *See Nat'l Adver. Co. v. City of Miami*, 402 F.3d 1335, 1339 (11th Cir. 2005) ("[W]hile it is true that our review of a suit's ripeness is at its most permissive in cases concerning putative violations of the First Amendment, th[e ripeness] requirement may not be ignored." (citations omitted)).

Moreover, the court is not convinced that the relaxed standard would apply to this case.  The primary reason that the ripeness requirement has been relaxed in First Amendment cases is because of the fear that the challenged statute or regulation would create a chilling effect on speech.  *See Beaulieu v. City of Alabaster*, 454 F.3d 1219, 1227-28 (11th Cir. 2006) (noting the more permissive review of ripeness in First Amendment cases and discussing "the fear that free speech will be chilled even before the law, regulation, or policy is enforced" (quoting *Hallandale Prof'l Fire Fighters Local 2238 v. City of Hallandale,* 922 F.2d 756, 760 (11th Cir. 1991)) (internal quotation marks omitted)).  However, any chilling effect on speech is not yet a concern in this case because of the safe harbor and enforcement delay; thus, EWTN cannot now claim that there is a chilling effect on its speech because it fears

---

purely legal, this does not transform EWTN's claims into ripe ones.

46

"risking criminal or severe civil sanctions" for noncompliance with the Mandate.[25]  *Dermer v. Miami-Dade Cnty.*, 599 F.3d 1217, 1221 (11th Cir. 2010) (quoting *Elend,* 471 F.3d at 1211).  Further, "there [is no] allegation by [EWTN] that their own protected speech, or anyone else's, is being chilled; rather they complain that the Mandate in its current form *compels* them to engage in speech which they find objectionable but in which they have not yet actually engaged." (emphasis in original)).  *Persico*, 2013 WL 228200, at *11; *see also Nebraska ex rel. Bruning*, 877 F. Supp. 2d at 803 (noting that though the chilling effect is a concern in First Amendment cases, because the plaintiffs did not face "a direct and immediate dilemma that involve[d] the sacrifice of their First Amendment rights," ripeness could not be established "even under a relaxed standard").  Accordingly, the ripeness of EWTN's claims is not affected by the relaxed standard that it asks the court to apply.

## 2.  Hardship

Finally, as to the hardship prong of the ripeness analysis, EWTN correctly observes that if a dispute otherwise qualifies as fit for review, any lack of hardship is irrelevant.  (*See* doc. 33 at 24-25 (quoting *Harrell v. The Fla. Bar*, 608 F.3d 1241, 1259 (11th Cir. 2010)).)  Conversely, in some circumstances, if a claim is questionably fit, extreme hardship may weigh the balance in favor of judicial review.  *See Consol. Rail Corp. v. United States*, 896 F.2d 574, 577 (D.C. Cir. 1990).  What actually constitutes hardship will inevitably change

---

[25]  As defendants further observe, the relaxed analysis only applies where there is a "credible threat" of enforcement.  (Doc. 36 at 3 n.2).

depending on the case, however, it cannot simply be a mere inconvenience—it must be "immediate and significant."  *Abbott Labs.*, 387 U.S. at 153; *see also Harrell*, 608 F.3d at 1258 ("The hardship prong asks about the costs to the complaining party of delaying review until conditions for deciding the controversy are ideal."); *Elend*, 471 F.3d at 1211 ("Hardship can sometimes be established if a plaintiff demonstrates that he would have to choose between violating an allegedly unconstitutional statute or regulation and risking criminal or severe civil sanctions." (citing *Steffel v. Thompson,* 415 U.S. 452, 462 (1974))); *Pittman*, 267 F.3d at 1280-81 (discussing *Ohio Forestry Ass'n v. Sierra Club*, 523 U.S. 726 (1998), and listing some types of hardship that might weigh a case in favor of judicial review, such as "adverse effects of a strictly legal kind," "whether the challenged policy inflicts significant practical harm upon the interests that the [plaintiff] advances," and "any other way in which the [policy] could now force it to modify its behavior in order to avoid future adverse consequences" (alterations in original) (internal quotation marks omitted)).

Further, allegations that a party must presently begin planning for future events which are speculative, or even the inability to plan at all for future events, have generally not constituted hardship sufficient to satisfy the hardship requirement.  *See Wheaton Coll.*, 887 F. Supp. 2d at 113 (no hardship where plaintiff desired to plan for contingencies); *Cephalon, Inc. v. Sebelius*, 796 F. Supp. 2d 212, 218-20 (D.D.C. 2011) (spending financial resources now to plan for "remote and speculative" future events did not constitute hardship).

Here, EWTN claims that it faces imminent hardship absent immediate review because

the ANPRM will not alter its claims, and it must begin planning now to address the financial problems it will be faced with as a result.  (Doc. 33 at 30.)  It further claims that it could be subject to third-party lawsuits attempting to enforce the Mandate, since the safe harbor only protects it against the defendants.  (*Id.* at 30-31.)  However, the court finds that "[EWTN's] hardship claim is insufficient for any [ripeness] exception."  *Pub. Citizen v. Office of U.S. Trade Representatives*, 970 F.2d 916, 921 (D.C. Cir. 1992).  Said differently, EWTN has not shown hardship that is sufficient to overcome its unfit claims because it cannot establish that the alleged harms it faces are "immediate and significant," *Abbott Labs.*, 387 U.S. at 153.

EWTN furthers the same failing arguments regarding hardship that were made in the numerous other cases addressing the Mandate, most of which held that there was no hardship sufficient to weigh the balance in favor of judicial review.  *See, e.g.*, *Roman Catholic Diocese of Dallas*, 2013 WL 687080, at *16 ("[T]he inability to prepare for contingencies is not a hardship that outweighs the unfitness for review of the issues in this case."); *Conlon*, 2013 WL 500835, at *6 (necessity of postponing judicial review outweighed "purported hardship . . . in [plaintiffs'] ability to plan for contingencies"); *Wheaton Coll.*, 887 F. Supp. 2d at 113 (planning insecurity not enough to show hardship); *Nebraska ex rel. Bruning*, 877 F. Supp. 2d at 802-03 (desire to plan for contingencies that may never arise did not constitute hardship); *Belmont Abbey*, 878 F. Supp. 2d at 41 (neither planning for the possibility of being forced to give up health insurance plan in 2014 nor risk of third-party lawsuits created hardship sufficient to overcome the lack of fitness for judicial review).

49

In addition, the court agrees with defendants that if planning for the future were to constitute hardship, "the hardship prong would become meaningless because organizations are always planning for the future." (Doc. 36 at 12.) Others courts have agreed. *See Tenn. Gas Pipeline Co. v. FERC*, 736 F.2d 747, 751 (D.C. Cir. 1984) (planning insecurity not enough to constitute hardship); *Bethlehem Steel Corp. v. EPA*, 536 F.2d 156, 162-64 (7th Cir. 1976) (uncertainty in business and capital planning not immediate and direct enough to constitute hardship); *Cephalon, Inc.*, 796 F. Supp. at 218-20 (D.D.C. 2011) (financial planning for "remote and speculative" future events did not constitute hardship). And in addition, the "theoretical possibility" of third-party lawsuits is not sufficient to establish the requisite hardship to overcome a lack of fitness for review. *Belmont Abbey*, 878 F. Supp. 2d at 41. Ultimately, "the ripeness doctrine requires a pragmatic and commonsense application," *Eagle-Picher Indus., Inc. v. EPA*, 759 F.2d 905, 918 (D.C. Cir. 1985); in this case, common sense weighs in favor of withholding judicial review until new regulations are created and finalized. At that point, if EWTN still has objections, it may then file suit.

## IV. CONCLUSION

Based on the foregoing and as directed by the court's Order entered contemporaneously with this Opinion, defendants' Motion to Dismiss will be granted. EWTN's case will be dismissed without prejudice.

50

**DONE**, this 25th day of March 2013.

*Sharon Lovelace Blackburn*

SHARON  LOVELACE  BLACKBURN
CHIEF UNITED STATES DISTRICT JUDGE